UNITED STATES OF AMERICA,     )
    )
             Plaintiff,     )
    )
           v.     )     No. 4:09 CR 718 HEA/DDN
    )
ANDREW JOSEPH HYER,     )
    )
           Defendant.     )

## ORDER AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This action is before the court upon the pretrial motions of the parties which were referred to the undersigned Magistrate Judge under 28 U.S.C. § 636(b). A pretrial hearing was held on March 5, 2010. The parties requested and the court granted them a period of time to file post-hearing memoranda. See (Doc. 32.)

Before the court are the motions of (a) defendant Andrew Joseph Hyer to suppress evidence of statements (Doc. 23) and to suppress physical evidence (Doc. 24); and (b) the government for a determination of the admissibility of the arguably suppressible evidence (Doc. 15; Doc. 21).

From the evidence adduced at the hearing, the undersigned makes the following findings of fact and conclusions of law:

## FACTS

### October 2004 to February 2005

1.      In October 2004, Clayton, Missouri, Police Detective Kenneth Nix was a member of the Greater St. Louis Regional Computer Crime Education and Enforcement Group (RCCEEG) investigating the exploitation of children, especially child pornography. That month he received information from the cyber-tip-line of the National Center for Missing and Exploited Children about a specific America Online (AOL) internet account that uploaded three images of child pornography. AOL responded to a subpoena for the identity of the subscriber of the account by indicating the account belonged to Andrew Hyer who lived in an apartment on Westwood in Clayton, Missouri. Through further investigation, Det. Nix learned Hyer's telephone number and address. After receiving this

information, Nix went on several occasions to this address but no one was there.

2.   Around 9:30 p.m. on February 8, 2005, Det. Nix drove to Hyer's residence, Apt. 2S at 625 Westwood.  Nix was dressed in plain clothes and was with a uniformed police officer.  Nix saw a light on in the apartment and knocked on the front door.  When there was no answer, he called Hyer's phone number and left a message on the recorder.  Shortly thereafter he saw the light turned off and he then returned to the apartment, but at the rear door.  Hyer opened the rear door and asked the officer why he was looking for him.  Det. Nix responded that he was investigating the use of the computer to access child pornography.  Nix asked Hyer whether they could go into the apartment.  Hyer asked him if that was necessary.  The detective responded that their conversation could take a considerable amount of time.  Hyer then allowed the officers to enter his apartment.

3.   All three sat in the living room of the apartment.  Det. Nix asked Hyer questions, which Hyer answered.  Hyer admitted subscribing to the AOL account that Nix was investigating.  Nix asked whether they could search his computers and Hyer agreed.  The detective gave Hyer a preprinted Permission To Search Form, Government Exhibit 1.  The language of the form indicated that Hyer gave Det. Nix and members of RCCEEG consent to search his "Desktop--Tower Computer" and the data contained in it.  The form further stated,

> It should also be noted that I possess the legal authority to authorize a police search of the premises and/or property designated herein.  I also release the seizing Officers and examining RCCEEG members of the responsibility of any possible accidental loss of data during the forensic examination.

The form was signed by Hyer and Det. Nix.  (Gov. Ex. 1.)

4.   Next, Det. Nix examined Hyer's computer and found five images of pornography, four of which involved minor males.  Nix then told Hyer that, because he had found child pornography on the computer, he was seizing it.  Based upon Hyer's statements regarding another computer in the apartment, Det. Nix seized it also.  Nix then asked Hyer whether he could look in his desk drawers.  Hyer said No.  Therefore, the officers left the apartment with the two computers.

5.     At no time on February 8, 2005 did Det. Nix or the uniformed officer threaten or intimidate Hyer to get him to allow them to enter the apartment, to get him to answer questions, or to consent to the search of the computer.  Hyer did not appear intoxicated.  Neither officer drew a weapon.

6.     With the information thus far learned in the investigation, Det. Nix applied to the Circuit Court of St. Louis County for a search warrant for Hyer's computers, related electronic equipment, and his apartment residence.  In support of the application, Det. Nix submitted his sworn, written affidavit.  In his affidavit, Det. Nix described the investigation, including the information about child pornography involving an e-mail account that AOL identified as being subscribed by Drew Hyer at 625 Westwood Dr. in Clayton, Missouri.  The affidavit provided six screen names that had been assigned to the account.  The affidavit then described the failed attempts to contact the resident of the apartment on Westwood and the interview of Hyer on February 8, 2005. The affidavit stated that Hyer's computer was consensually searched and an image depicting child pornography was seen on it.  The affidavit stated that Hyer told the officers that he frequently visits Yahoo! Web Groups and that other images of child pornography might be on the computer.  Further, the affidavit indicated that Hyer refused the officers permission to search his desk, that an examination of the seized computer the next day revealed 300 images of child pornography which had been deleted during the previous month, that the search of the computer indicated that Hyer would download and store images of child pornography, and that a file image of child pornography had been created on November 19, 2004 and was last accessed on January 13, 2005.  (Gov. Ex. 2.)

7.     Based on this affidavit, on February 10, 2005, at 12:15 p.m., Associate Circuit Judge Mary Bruntrager Schroeder issued a search warrant as requested.  (Id.)

8.     On February 11, 2005, Det. Nix and other officers executed the search warrant by going to Hyer's residence at approximately 9:00 a.m. Det. Nix knocked on the door of the apartment and announced their presence.  Hyer answered the door.  Det. Nix told him he had a search warrant for the premises.  Hyer was surprised that the officer had

returned. The officers then entered the apartment and formally arrested Hyer, telling him it was because of the child pornography. Hyer's apartment was searched and items were seized from it. (Gov. Ex. 2.)

9.     Hyer was transported to the St. Louis County Justice Center for incarceration. At the Justice Center, Det. Nix advised Hyer of his constitutional rights to remain silent and to counsel, reading them to him from a "Miranda Warnings" form, Government Exhibit 3. Nix asked Hyer to sign the form, if he understood it. At 9:13 a.m. Hyer signed it. Det. Nix and Officer Hendrix also signed, as witnesses. The form also included the question, "Having these rights in mind, do you wish to talk to us now?" (Gov. Ex. 3.) Hyer said he would talk with them.

10.     a.     Thereafter, Det. Nix interviewed Hyer in a small interview room. Hyer was seated without handcuffs next to a desk. Nix sat a short distance away from Hyer and uniformed Officer Hendrix was also in the room. The interview was video-taped, beginning with the signing of the "Miranda Warning" form and ending with Hyer writing a statement after the interview.[1] Det. Nix asked Hyer questions for approximately an hour and Hyer made oral statements about downloading images of child pornography. Occasionally during the interview and towards the end of the interview, Officer Hendrix asked Hyer a few questions which Hyer answered.

b.     As the interview began, Hyer appeared calm, he answered questions, avoided answering some questions directly, remained silent when no question was pending, and at times led the discussion. At approximately 20 minutes into the interview, he said he "was sick" about being in this predicament and that he did not want to go to jail. He then offered information.

c.     At approximately 25 minutes into the interview, Det. Nix asked Hyer if he had any questions for him and Hyer asked what was going to happen to him. Nix then explained the officers' investigative interests in his activities.

d.     At one point, Det. Nix told Hyer that he could present the case either to the state prosecutor or to the federal prosecutor.

_____

[1]The video recording did not include the oral advise of rights. The undersigned has watched the video recording, Government Exhibit 4.

Because of what they had found on Hyer's computer up to that time, Nix told Hyer he intended to present the case to the state prosecutor, not the federal.

      e.    Det. Nix asked Hyer whether he would write out a statement. Hyer said that his hand was shaking. Nix then offered to get Hyer something to drink. When going over the form for the written statement, Hyer stated that he did not know how to phrase the language. Nix said for him just to state things in his own words. Det. Nix then gave Hyer a "Voluntary Statement" form.

      f.    Nix told Hyer that he was going to have to arrest him and process him, before he would be released. Hyer appeared disappointed at this and sat silently. Nix explained that he had had the choice of doing that or arresting him and holding him for 20 hours before releasing him, but that he had decided not to hold him.

      g.    Nix asked Hyer whether he wanted to call his boss. Hyer declined, saying that there was no need to do that. Det. Nix then explained the booking and release process to Hyer.

      h.    Nix went and reviewed the written statement form with Hyer. The form contained a printed version of the <u>Miranda</u> warnings which Det. Nix read out loud with Hyer. Further, the form stated:

    A.    No one denied me any of my rights, threatened or mistreated me, either by word or act, to force me to make known the facts in this statement. No one gave, offered or promised me anything whatsoever to make the facts in this statement, which I gave voluntarily of my own free will.

    B.    I do not want to talk to a lawyer before or during the time I give the following statement, being fully aware that I am waiving my rights to have a lawyer present to represent me.

    C.    I certify by my signature that no attempt was made by any law enforcement officer to prompt me what to say, nor was I refused any request that the statement be stopped, nor at anytime during this statement did I request the presence or advice of a lawyer.

(Gov. Ex. 5.) At that time, Nix offered Hyer something to drink. Hyer said all he wanted was water, which Nix left the room to get. In Nix's absence, Hyer asked Officer Hendrix about how to write the statement.

Hendrix told him just to begin generally and then write what happened. For approximately 10 minutes Hyer considered what he would write and handwrote some statements. During this period, neither Nix nor Hendrix paid much attention to Hyer as he wrote his statement. A few minutes later Nix looked at the statement and asked Hyer to include information about how the subject images got onto his computer. Hyer took the statement form back and handwrote more. Hyer handwrote a two-paragraph statement on a page attached to the "Voluntary Statement" form. Hyer signed the form at 10:10 a.m. on February 11, 2005. (Id.) At no time during the interview were promises or coercion used to induce Hyer to cooperate and give his statements.

       j.    Next, Det. Nix asked Hyer questions for biographical information for the booking process. Hyer answered the questions.

    11.    At no time did Det. Nix threaten Hyer or make any promises to him to get him to waive his rights and to make statements. At no time did Hyer appear intoxicated, not lucid, or too fatigued to answer questions. At no time during the interview did Hyer invoke his right to remain silent or invoke his right to the services of legal counsel. During the interview, Det. Nix gave Hyer an opportunity to use the restroom. At the conclusion of the interview and the arrest booking procedure, on February 11, 2005, Hyer was released from custody.

<u>May 7, 2009</u>

    12.    On May 7, 2009, St. Louis County Police applied for a search warrant for Hyer's residence at 619 Westwood Dr., Apartment 3N, in Clayton, Missouri. In support of the application for the search warrant, St. Louis County Police Det. Darren Starzyk submitted his sworn, written affidavit to the Circuit Court of St. Louis County. In his affidavit he described his and Sgt. Adam Kavanaugh's backgrounds as police officers and their experience investigating child pornography. The affidavit described April 20, 2009 information received from the National Center for Missing and Exploited Children and the subsequent investigation from AOL that on two occasions in March 2009 the user of a specific e-mail address uploaded images of child pornography. In response to a subpoena in March 2009, AOL indicated that the subscriber to the subject AOL

account was Drew Hyer at 625 Westwood Drive, Clayton. Collateral investigations yielded information about the February 2005 arrest of Hyer for possessing child pornography, and indicated that Hyer now resided at 619 Westwood, Apartment 3N. The affidavit also contained the opinions of Det. Starzyk, based on his training and experience, about the activities of persons who access and collect child pornography and the uses of their computers in their own homes. Upon this affidavit, at 1:55 p.m. on May 7, 2009, Associate Circuit Judge Lawrence J. Permuter issued a search warrant for 619 Westwood Drive, Apt. 3N, Clayton, Missouri, to search for evidence of child pornography. The warrant was executed the same day and four categories of items were seized. (Gov. Ex. 6.)

13. On May 7, 2009, St. Louis County Police Officer Francis Gomez and other officers executed the search warrant on Hyer's apartment at 619 Westwood Dr. The St. Louis County Tactical Operations Unit entered the residence forcibly after knocking and announcing their presence several times and getting no response. Once inside, the officers located Andrew Hyer and handcuffed him until the residence was secured.

14. a. Officer Gomez entered the residence, uncuffed Hyer, and, because the apartment was small, Gomez took him outside where he identified himself and Det. Starzyk. He told Hyer the officers were there to execute a search warrant for child pornography. Gomez told Hyer he was not under arrest and then advised him of his constitutional rights to remain silent and to counsel. He asked Hyer whether he understood his rights and Hyer answered Yes.

b. Gomez then interviewed Hyer without telling him that he was surreptitiously audio recording the interview. (Gov. Ex. 7.)[2] For approximately 33 minutes Officer Gomez asked Hyer questions and Hyer made oral statements about the facts of the investigation.

c. At approximately 22 minutes and 15 seconds into the interview the following colloquy occurred:

Hyer:     I am not going to say any more, because I feel right now like I am being railroaded.

_____

[2]Government Exhibit 7 is a compact disk on which (on Track 1) this interview with Officer Gomez is recorded. The undersigned has listened to the recording.

```
Gomez:      OK. I am not trying to railroad you.  I am just
            trying to get to the truth.  OK? That's all I am
            trying to do.  And if you feel a certain way, as
            far as anything, then that's what I am trying to
            find out.  I want to know, I want to make sure you
            are not the guy that's going to be looking at the
            kids. . . .

Hyer:       No.

Gomez:      OK.  We're simply talking about, in the privacy of
            your own home, with pictures of young teen boys.

Hyer:       And older.
```

The conversation continued as before this exchange.  (Gov. Ex. 7, Track 1.)

        d.    At approximately 23:35, the following colloquy occurred:

```
Gomez:      I just want to be sure, like I said, that we're not
            getting any kids who are going to be hurt or
            anything like that.
```

In response, Hyer mentioned that he was 45 years of age.

        e.    At approximately 28:55, Hyer referred to making the investigation "go away" and stated, "Is there anything I can do?"  Det. Gomez responded by saying that the officers would like to talk with him more.

        f.    At approximately 30:15, Hyer said he had been in the midst of purchasing some antique jewelry on eBay when the officers forcibly entered his apartment to execute the search warrant.  In this context, Hyer asked, "Can I call somebody?"

        g.    Shortly thereafter, Hyer asked, "What are you going to do with me?"  Gomez replied, "What we would like to do is ask you a few more questions in a little more private setting.  So, I mean, we are outside here," referring to the fact that he had taken Hyer outside the apartment while the other officers were searching.  Hyer said, "I just want to go home."

        h.    At approximately 31:00, the following colloquy began:

```
Gomez:      OK. . . . So, we are just trying to get to the
            bottom of things.  OK.  We would appreciate it if
            you would, you know, come talk with us and sit in
            our office where we can have more privacy.
```

| Hyer: | If that's the case, I really need to call somebody to . . . I mean . . . I want to be cooperative as I can. I don't want this to turn into a huge thing. OK? I've done my best to answer your questions. You are not going to let me go home, obviously. |
|---|---|
| Gomez: | I believe you're being honest. I'm not denying that. |
| Hyer: | You're going to haul me into the police station. |
| Gomez: | I'm asking you. If you'll come with us voluntarily to speak in a more private setting. |
| Hyer: | Or are, you're going to arrest me and take me? |
| Gomez: | I have to check with my boss on [what] the status of that is for right now. |
| Hyer: | OK. |
| Gomez: | I'm not giving you an option of will you come willing or we'll arrest you. I'm asking, Will you come willingly. As far as anything beyond that, I'll have to talk to my supervisor to figure out what we are going to do from there. But, what I'm basically doing is asking whether you would come with us voluntarily to speak with us? |
| Hyer: | If you'll let me go upstairs and get dressed, I'll come with you. Yes. |
| Gomez: | OK. |
| Hyer: | But if you're saying, Oh no, we have to bring clothes. . . . |
| Gomez: | I'll check and see. My guess is my supervisor will . . . |
| Hyer: | And what about securing my apartment? |
| Gomez: | We'll take care of that. We'll figure out a way to secure it. We're not going to leave it unsecured. OK? We're not going to do that. But I'll ask my boss to see if I can bring you up. I won't promise you anything right now. OK? All right. |

After approximately 33 minutes, the recording ended. (Gov. Ex. 7, Track 1.)

i. During this interview outside Hyer's residence, no threat was made to Hyer, no weapon was drawn to get him to cooperate, and no misrepresentation was made to him. In May 2009, Hyer was of mature age. During this interview, Hyer was nervous but was forthcoming with the officers, he was not intoxicated, he understood what the officer said and what was occurring in his residence, he appeared to be intelligent, and he was responsive to the questioning.

15. After the interview ended, Officer Gomez and Det. Starzyk drove Hyer to the St. Louis County Police Department in Clayton; during the two to three minute drive, there was no conversation between Hyer and the officers.

16. a. At the police station, Hyer was interviewed by Det. Starzyk. Before the questioning, Starzyk reminded Hyer and Hyer affirmed that he had come to the police station voluntarily, that he had not been in handcuffs in the police car, and that he had been read his rights at the apartment. Det. Starzyk then presented Hyer with a new "Warning and Waiver Form," Government Exhibit 8. Starzyk read the form, which stated the constitutional rights to remain silent and to counsel, to Hyer. At each of the four statements of rights, Hyer wrote his initials to indicate that he understood the right. The form next stated:

> I have read the above statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Hyer signed his name to this form at 7:09 p.m. (Gov. Ex. 8.) Thereafter, Det. Starzyk interviewed Hyer and the interview was recorded.[3] Hyer made oral statements in answer to the officer's questioning and statements.

b. At the beginning of the interview, Det. Starzyk asked Hyer, "Are you willing to talk to us about this?" Hyer answered, "Well, now that you're saying it is going to be used against me in a court of

---

[3]Det. Starzyk's interview of Hyer in the police department is recorded on Tracks 2, 3, and 4 of Government Exhibit 7. The undersigned has listened to this recording.

law, I really don't want to.  I mean I tried to be as honest and forthright with you."  The colloquy continued:

> Starzyk:  Yeah, and we appreciate that and like I said and like Det. Gomez says, we are not here to judge you.
>
> Hyer:  Right.
>
> Starzyk:  We are just, obviously, the reason we were at your residence is child pornography.  We're concerned that we need to get those off your computer.
>
> Hyer:  Uh-huh.
>
> Starzyk:  Basically, we're trying to find out where they're coming from, OK, and you had talked about the folder you had kept those in?
>
> Hyer:  Right.
>
> Starzyk:  And what was the name of that folder?

Hyer continued answering the officer's questions without being coerced by the officer.  At 7:36 p.m., after 30 minutes, Det. Starzyk took a break from the interview.  (Gov. Ex. 7, Track 2.)

      d.  At 7:46 p.m. the recorded interview continued, with Hyer answering questions without coercion.  At 8:06 p.m. they took another break.  (<u>Id.</u>, Track 3.)

      e.  At 8:08 p.m. the interview continued, with Det. Sgt. Kavanaugh stating for the record that Hyer had been offered but declined water and the opportunity to use a restroom.  During this last portion of the interview, Sgt. Kavanaugh and Hyer discussed an image which Kavanaugh had Hyer initial to identify the image Hyer had been shown.  At approximately 8:27 p.m., Hyer gave Det. Sgt. Kavanaugh his computer password and they all viewed Hyer's computer monitor and discussed an image shown on it.  At the end of the interview, Kavanaugh gave Hyer a copy of the search warrant return document and at approximately 8:41 p.m. the interview recording ended.  (<u>Id.</u>, Track 4.)

      f.  During the interview defendant appeared nervous but cooperative.  Hyer did not appear intoxicated or fatigued.  No threat, promise, or misrepresentation was made to induce him to make any statement or cooperate.  After the interview, Hyer left the police

station without being arrested.  Hyer never asked for an attorney during the interview.

17.   On May 28, 2009, Det. Starzyk applied for a federal search warrant to obtain the contents of electronic communications from America OnLine, for the period February 1, 2005 to March 8, 2009, for the e-mail accounts of Andrew Hyer.  In support of the issuance of the search warrants, Det. Starzyk submitted his sworn, written affidavit which recounted the investigation of Hyer and described the investigative information of February 2005, and April, March, and May 2009.

## DISCUSSION

### A. Fourth Amendment Issues

The Fourth Amendment to the Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."  U.S. Const. amend. IV.  To secure these rights, the Fourth Amendment provides "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  Id.  The goal of the Fourth Amendment is to ensure that a search will be carefully tailored to its justifications, and will not become a wide-ranging exploratory search.  Maryland v. Garrison, 480 U.S. 79, 84 (1987).

### 1.   Entry into the Apartment

When police officers enter private property with the consent of the occupant, but restrict their movements to areas generally accessible to the public, their actions do not rise to the level of a "search" for Fourth Amendment purposes.  United States v. Spotted Elk, 548 F.3d 641, 655 (8th Cir. 2008), cert. denied, 129 S. Ct. 1658 (Mar. 23, 2009).  Even without probable cause, police may knock on a door.  Id.  This "knock and talk" procedure does not "contravene the Fourth Amendment, even absent reasonable suspicion."  Id. (quoting United States v. Cruz-Mendez, 467 F.3d 1260, 1264 (10th Cir. 2006)).  However, if police assert their

authority, refuse to leave, or otherwise indicate that the suspect cannot refuse to open the door, the encounter may soon implicate the Fourth Amendment.  Id.

In this case, on February 8, 2005, Det. Nix went to the rear door of Hyer's apartment and asked whether he could enter the apartment. After an initial question, Hyer consented, and allowed the officers into his apartment.  There is no evidence the police asserted their authority as a means of entering the apartment.  Their entry does not implicate the Fourth Amendment.

**2.    Search of the Computer**

Voluntary consent provides a notable exception to the warrant and probable cause requirements of the Fourth Amendment.  United States v. Sanders, 424 F.3d 768, 773 (8th Cir. 2005).  Under the Fourth Amendment, a search is legal if the subject of the search gives his consent, and that consent is knowing and voluntary.  Id.  The government bears the burden of proving that a defendant's consent to a search was voluntary by a preponderance of the evidence.  United States v. Willie, 462 F.3d 892, 896 (8th Cir. 2006).  The question of voluntariness requires a review of all the facts, including the characteristics of the accused and the details of the interrogation, and examines whether consent was given without any form of police coercion.  Sanders, 424 F.3d at 773; United States v. Fleck, 413 F.3d 883, 891-92 (8th Cir. 2005).

On February 8, 2005, Det. Nix asked Hyer whether he could search his computers.  Hyer, who was then approximately 41 years of age, agreed and signed a Permission to Search Form.  At the time Hyer gave his consent, Hyer was seated in his living room.  It was 9:30 at night, and Hyer did not appear intoxicated.  Neither Det. Nix or the other officer threatened or intimated Hyer so that he would consent to the search of the computer. Neither officer drew his weapon, and Hyer was never placed in custody. See Sanders, 424 F.3d at 773 (listing factors to consider when determining whether a suspect's consent was free and voluntary).  Looking to the totality of circumstances, Hyer's consent to search his computer was voluntary.

**3.  Seizure of the Computers**

After Det. Nix obtained Hyer's consent, he searched the desktop computer.  This search revealed four images of child pornography.  The incriminating nature of these images was immediately apparent, justifying seizure of the computer.  See United States v. Alexander, 574 F.3d 484, 491 (8th Cir. 2009), petition for cert. filed (Oct. 14, 2009)(No. 09-7758); United States v. Rosario, 558 F. Supp. 2d 723, 727-28 (E.D. Ky. 2008).  The discovery of child pornography on this computer provided probable cause for the officers to seize Hyer's other computer as well.  See United States v. Daugherty, 317 F. App'x 418, 419 (5th Cir. 2009) (per curiam) (holding that officers' discovery of pornographic images, coupled with defendant's change in demeanor, provided probable cause to seize his laptop and hard drive pending a search warrant).  The seizure of Hyer's other computer was also justified by exigent circumstances.  See Rosario, 558 F. Supp. 2d at 728.  Had the officers not immediately seized the computer, Hyer could have damaged or deleted any incriminating images from that computer.  Id.  "The risk of the disappearance of the photos on the computer clearly outweighs [the defendant's] privacy interest."  Id.  The officers' seizure of the two computers did not violate the Fourth Amendment.

**4.  2005 Search Warrant Application**

The issue before this court when reviewing the validity of the issuance of the 2005 search warrant is whether the supporting materials gave the issuing judge a substantial basis for concluding that probable cause existed for the issuance of the warrant.  United States v. Stevens, 439 F.3d 983, 987 (8th Cir. 2006) (citing Illinois v. Gates, 462 U.S. 213, 238-39 (1983)).  For a warrant to issue properly under the Fourth Amendment, the warrant must be supported by probable cause.  Gates, 462 U.S. at 238-39.  Probable cause exists, if under the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place."  Id.  In deciding whether there is probable cause to support a warrant, a judge may draw reasonable inferences from the totality of the circumstances.  United States v. Summage, 481 F.3d 1075, 1079 (8th Cir. 2007).

On February 10, 2005, Judge Schroeder issued a search warrant for Hyer's apartment, his computer, and his other digital media and storage devices. In support of the search warrant, Det. Nix provided Judge Schroeder with an affidavit detailing his investigation. The affidavit noted Det. Nix's training, that Hyer had been linked to an e-mail account involving child pornography, that the officers had found child pornography on one of his computers during a consensual search of the computer, and that a subsequent search of that computer had revealed over 300 images associated with child pornography. Hyer himself told the officers that he frequently visited Yahoo! Web Groups, and that images of child pornography might be on his other computer. See United States v. Shields, 458 F.3d 269, 273 (3d Cir. 2006) (Agent's affidavit noted that "when an individual uploaded and transmitted child pornography to the [Web] group, those images were transmitted to every one of the group members. . . ."). Finally, the affidavit noted that one of the files found on Hyer's computer, labeled "explore.bmp," showed two prepubescent males touching each others' genitals.

Taken as a whole, this evidence clearly provided Judge Schroeder with probable cause to issue the search warrant. See United States v. McArthur, 573 F.3d 608, 613-14 (8th Cir. 2009) (noting that "'images of child pornography are likely to be hoarded by persons interested in those materials in the privacy of their homes. . . .'"); see also Alexander, 574 F.3d at 491 ("The discovery of child pornography during the search for evidence of privacy invasion supplied ample probable cause for a warrant to conduct further searches of Alexander's home, computer, and digital camera.").

**5. Execution of the Search Warrant in 2005**

The particularity requirement serves the goals of the Fourth Amendment by preventing general "rummaging in a person's belongings" and preventing "the seizure of one thing under a warrant describing another." Andresen v. Maryland, 427 U.S. 463, 480 (1976). Whether or not to seize an item is not within the discretion of the officer executing the warrant. Id. A search warrant is adequately worded if its description of the evidence to be seized is sufficiently definite to enable the

searching officers to identify the property authorized to be seized. Summage, 481 F.3d at 1079. How definite or specific a warrant must be will depend on the circumstances of the case and on the type of items involved. Id. The particularity requirement is a standard of practicality rather than technicality. Id. When conducting a search, officers do not need to determine the precise nature of an item on-site. Id. In an effort to preserve an individual's privacy, officers may analyze the nature of relevant materials off-site. Id.

Based on the supporting affidavit, Judge Schroeder issued the search warrant. The warrant authorized a search of the two computers and the floppy disk the officers had already seized, as well as

> a computer system, including but not limited to system
> components, input devices, out put devices, data storage
> devices, data transmission devices, network devices, computer
> media, and other material relating to the computer systems
> including but not limited to documentation, operating
> software, application or access program disks, manuals, books,
> log files, configuration files, passwords, peer to peer file
> sharing programs, IP addresses, and all images of child
> pornography in whatever form they may be found or
> stored. . . .

(Gov. Ex. 2.) The officers were to search Hyer's residence at 625 Westwood, Apartment 2S, for these items. Id.

In searching the apartment, officers seized a number of items from Hyer's bedroom and living room. The seizure of the seven video tapes and four cameras was authorized by a search for "all images of child pornography in whatever form they may be found or stored;" the seizure of all the floppy disks and the container of CDS was authorized by a search of "data storage devices;" the seizure of the book was authorized by a search of "books;" and the seizure of the fifteen pieces of paper with user names, screen names, and passwords was authorized by a search of "passwords."

Hyer argues that the search warrant acted as a general search warrant, authorized an overly broad search, and failed the particularity requirement of the Fourth Amendment. The Constitution demands that the language of a search warrant be sufficiently definite to enable the searcher to reasonably ascertain and identify the things authorized to be seized. United States v. Saunders, 957 F.2d 1488, 1491 (8th Cir.

1992).  This standard is one of "practical accuracy," and recognizes that the degree of detail required necessarily depends on the circumstances of the case and the type of items involved.  Summage, 481 F.3d at 1079; Id.  In the context of child pornography cases, generic terms are often a practical necessity.  See United States v. Alexander, No. 06-363-CR-W-FJG, 2007 WL 2712043, at *21 (W.D. Mo. Sept. 14, 2007), aff'd, 574 F.3d 484 (8th Cir. 2009).  "Unlike with murder weapons or drugs, when an offense concerns the use of hard copy or electronic files and documents a court cannot be sure which files will be relevant and the warrant may not be able to state as specifically what should be searched and seized."  Id. (quoting United States v. Sassani, No. 97-4011, 1998 WL 89875, at *5 (4th Cir. Mar. 4, 1998) (unpublished per curiam)).

In this case, the search warrant authorized officers to search for specific items related to the downloading and storage of images of child pornography.  As noted in Alexander, these electronic files may be found in a number of different places and mediums.  Given these realities, the Eighth Circuit has found that a search warrant for "all video tapes and DVDs, pornographic pictures, video and digital recording devices and equipment, all equipment that is used to develop, upload, or download photographs and movies, computers, and any indicia of occupancy" satisfied the Fourth Amendment's particularity requirement.  Summage, 481 F.3d at 1079.  Looking to Alexander and Summmage, the 2005 search warrant was sufficiently particular.

### 6.    2009 Search Warrant Application

On May 7, 2009, Judge Permuter issued a search warrant for Hyer's apartment.  In support of the search warrant, Det. Starzyk provided Judge Permuter with an affidavit detailing his investigation.  The affidavit noted Det. Starzyk's training, and noted that AOL had identified Hyer as the subscriber who had uploaded images of child pornography in March 2009.  The affidavit also noted that Hyer had been previously arrested for possession of child pornography.  Finally, the affidavit noted that people who collect child pornography tend to keep the images for long periods of time, that they will trade these images with others, and that these images are often found on the individual's home computer.

- 17 -

Taken as a whole, this evidence clearly provided Judge Permuter with probable cause to believe contraband or evidence of a crime would be found at Hyer's residence.  See United States v. Terry, 522 F.3d 645, 648 (6th Cir. 2008), cert. denied, 129 S. Ct. 235 (Oct. 6, 2008) (finding search warrant for defendant's home was supported by probable cause, where the supporting affidavit linked defendant's e-mail address to two e-mail messages containing child pornography); United States v. Kling, No. CR06-3007-MWB, 2006 WL 1980179, at *5-*6 (N.D. Iowa July 12, 2006), Report and Recommendation Adopted by, 2006 WL 2054375 (N.D. Iowa July 21, 2006) (finding search warrant was supported by probable cause where Yahoo! records linked the defendant's e-mail address to uploaded images of child pornography).

Hyer argues that this search warrant relied on stale information, particularly the 2005 investigation.  While the affidavit referenced the 2005 investigation, the focus of the affidavit centered on the reports from the National Center for Missing and Exploited Children (received in early March 2009), and the subscriber information from AOL that linked Hyer to the uploaded images (received in late March 2009).  Since Judge Permuter signed the search warrant on May 7, 2009, the warrant did not rely on stale information.  See United States v. Harvey, 2 F.3d 1318, 1322-23 (3d Cir. 1993) (finding the evidence that defendant possessed child pornography thirteen to fifteen months previously was not stale because it was supported by evidence of additional mailings within two months of the warrant's execution).

**7.    Execution of the Search Warrant**

Based on the supporting affidavit, Judge Permuter issued the search warrant.  The search warrant, in relevant part, authorized a search of

> Photographs, files and graphic images depicting sexual contact . . . electronic data processing and storage devices, computers and computer systems including central processing units, internal peripheral storage devices such as fixed discs, external hard discs, floppy discs and diskettes, tape drives and tapes, optical storage [devices] or other memory storage devices, . . . any and all cameras and related equipment, video and audio recorders and all related recording equipment; any all photographs, copies of photographs and any manufactured hard copy of images related to child pornography; any and all logs containing user names, passwords and documentation. . . .

(Gov. Ex. 6.)

The police officers executed the search warrant on May 7, 2009, and seized a desktop computer, miscellaneous compact and DVD disks, a digital camera, and multiple VHS tapes. (Gov. Ex. 6.) The seizure of the desktop computer was authorized by a search for "computers;" the seizure of the compact disks, DVD disks, and VHS tapes was authorized by a search for "floppy discs and diskettes, tape drives and tapes, optical storage [devices] or other memory storage devices;" and the seizure of the digital camera was authorized by a search for "all cameras."

Hyer again argues that the search warrant acted as a general search warrant, authorized an overly broad search, and failed the particularity requirement of the Fourth Amendment. Looking to Alexander and Summmage, and for the reasons stated above, the 2009 search warrant was also sufficiently particular.

**8.    Federal Search Warrant for E-Mail Communications**

On May 28, 2009, United States Magistrate Judge Audrey G. Fleissig issued a search warrant for the contents of electronic mail communications from America Online (AOL). In support of the search warrant, Det. Starzyk provided Judge Fleissig with an affidavit detailing his investigation. The affidavit noted Det. Starzyk's training, and noted that AOL had identified Hyer as the subscriber who had uploaded images of child pornography in March 2009. The affidavit also noted that Hyer had been previously arrested for possession of child pornography, and that people who collect child pornography tend to keep the images for long periods of time and trade these images with others. Finally, the affidavit noted that officers had searched Hyer's apartment on May 7, 2009. During an interview that day, Hyer stated that he might have uploaded images of child pornography from his AOL e-mail account. (Gov. Ex. 9.)

Taken as a whole, this evidence clearly provided Judge Fleissig with probable cause to believe contraband or evidence of a crime would be found on Hyer's AOL e-mail account. See United States v. Wagers, 452 F.3d 534, 541 (6th Cir. 2006) (finding search warrant directed to defendant's AOL e-mail account was supported by probable cause, because

there is a distinct nexus "between an AOL email account and Internet-accessed child pornography, especially where some of that access has been through AOL IP addresses. . . .").

**9.    Viewing the Actual Images**

Hyer argues that the officers should have showed the alleged pornographic images to the issuing judges, so that they could determine whether the images were actually child pornography. The law does not require this. United States v. Christie, 570 F. Supp. 2d 657, 688 (D.N.J. 2008). "[A] magistrate judge is not required to actually view the images that are alleged to be child pornography before she can find probable cause to issue a warrant. Instead, she need only review a factual description of the images by law enforcement." Id. There is no Fourth Amendment violation.

## B.  Fifth Amendment Issues

The Fifth Amendment to the Constitution protects an individual from being "compelled in any criminal case to be a witness against himself. . . ." U.S. Const. amend. V. To safeguard an individual's Fifth Amendment rights, a suspect in custody must be warned, before being interrogated, that he has the right to remain silent and that any statement he makes may be used against him. Miranda v. Arizona, 384 U.S. 436, 444 (1966). In Miranda, the Supreme Court concluded that the inherently coercive nature of custodial interrogations blurred the line between voluntary and involuntary statements, heightening the risk that an individual would be deprived of the Fifth Amendment's protections. Dickerson v. United States, 530 U.S. 428, 435 (2000). The procedural safeguards prescribed by Miranda only apply to persons who are subjected to interrogation and who are in custody. Oregon v. Mathiason, 429 U.S. 492, 494-95 (1977) (per curiam). The simple fact that an investigation has focused on a particular suspect does not implicate Miranda if the setting is noncustodial. Minnesota v. Murphy, 465 U.S. 420, 431 (1984).

**1.    Oral Statements on February 8, 2005**

An individual is in custody if he has been formally arrested or if his freedom of movement has been restricted to a degree associated with a formal arrest. <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983). In determining the question of custody, the court first looks to the circumstances surrounding the interrogation. <u>Thompson v. Keohane</u>, 516 U.S. 99, 112 (1995). Given those circumstances, the court then asks whether a reasonable person would have felt at liberty to terminate the interrogation and leave. <u>Id.</u> The critical inquiry centers on whether the person's freedom to depart was restricted in any way. <u>Mathiason</u>, 429 U.S. at 495; <u>United States v. LeBrun</u>, 363 F.3d 715, 720 (8th Cir. 2004) (en banc). In making this inquiry, the court looks to the totality of the circumstances from an objective viewpoint, and not the subjective views of either the suspect or the officers. <u>Stansbury v. California</u>, 511 U.S. 318, 322-23 (1994); <u>LeBrun</u>, 363 F.3d at 720.

The Eighth Circuit has developed a series of factors to help determine when an individual is in custody. <u>United States v. Griffin</u>, 922 F.2d 1343, 1349 (8th Cir. 1990). These factors include: (1) whether the officer informed the suspect that the questioning was voluntary and the suspect was free to leave; (2) whether the suspect's freedom of movement was restrained during the questioning; (3) whether the suspect initiated contact with the authorities, or simply agreed to answer questions; (4) whether the officers employed strong-arm tactics or deceptive tactics during the questioning; (5) whether the atmosphere of the questioning was police-dominated; and (6) whether the officers placed the suspect under arrest at the end of the questioning. <u>Id.</u> These six factors are intended to be representative, rather than exclusive. <u>United States v. Axsom</u>, 289 F.3d 496, 501 (8th Cir. 2002). There is no requirement "that the <u>Griffin</u> analysis be followed ritualistically in every <u>Miranda</u> case." <u>United States v. Czichray</u>, 378 F.3d 822, 827 (8th Cir. 2004). Whether the six factors are consulted or not, the "ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest." <u>Id.</u> at 828.

On February 8, 2005, Det. Nix and a second officer spoke with Hyer at the rear door of his apartment. The officers explained why they were there, and asked Hyer if they could enter his apartment. Once inside,

Det. Nix asked Hyer questions, and Hyer made statements. At the time of the questioning, the officers did not threaten or intimidate Hyer in any way. The officers did not draw their weapons, and did not place Hyer under arrest after their encounter. The officers allowed Hyer to make a phone call when he asked. (Doc. 35 at 13.)

Looking to the totality of the circumstances, Hyer was not in custody when he answered Det. Nix's questions. On the one hand, Hyer did not initiate this encounter. The officers asked to enter his apartment and did not inform him that he was free to leave. On the other hand, Hyer was not restrained during the brief period of questioning, the questioning occurred in Hyer's apartment, and the officers did not employ any strong-arm tactics during the questioning. See Czichray, 378 F.3d at 826 ("When a person is questioned 'on his own turf,' [courts] have observed repeatedly that the surroundings are not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation."). After he answered the questions, Hyer was not placed in handcuffs or formerly arrested. Under the circumstances, Hyer was not in custody. See Griffin, 922 F.2d at 1349. Looking to Mathiason, the officers were not required to advise Hyer of his Miranda rights, and his statements on February 8, 2005, should not be suppressed.

**2. Oral Statements on February 11, 2005**

Statements made after a knowing and voluntary waiver of Miranda rights are admissible unless there were earlier, unwarned statements resulting from coercion or a calculated effort to undermine the suspect's free will. United States v. Briones, 390 F.3d 610, 614 (8th Cir. 2004).

After the officers arrested Hyer, they brought him to the St. Louis County Justice Center. Once there, Det. Nix advised Hyer of his constitutional rights to remain silent and to counsel. Hyer indicated he understood these rights, and signed a waiver of rights form. By signing this form, Hyer waived his Miranda rights. See North Carolina v. Butler, 441 U.S. 369, 372-76 (1979). After waiving his rights, Hyer made oral statements.

Before making these statements, and while he was making these statements, the police did not subject Hyer to any duress or coercion.

The officers did not draw their weapons or make any threats to induce his cooperation.  Indeed, Hyer appeared calm during the interview process, answering some questions, while avoiding directly answering others.  He did not appear intoxicated, incoherent, or too tired to answer questions.  During the questioning, he did not invoke his right to remain silent or his right to counsel.  Under the circumstances, his oral statements were made voluntarily and responsively, and were not induced by any improper government action.  See LeBrun, 363 F.3d at 724.  Hyer's oral statements at the St. Louis County Justice Center should not be suppressed.

### 3.    Written Statements on February 11, 2005

Det. Nix asked Hyer to write out a statement while he was at the Justice Center.  When Hyer said his hand was shaking, Det. Nix offered to get him something to drink.  Det. Nix also asked Hyer if he wanted to call his boss.  Finally, Det. Nix provided Hyer with a written waiver of rights form.  Hyer signed this form, asserting that he had not been threatened or offered any promises, and that he did not want to speak with a lawyer.  By signing this form, Hyer again waived his Miranda rights.  See Butler, 441 U.S. at 372-76.  After waiving his rights, Hyer wrote a two-paragraph statement.  Because Hyer made these written statements voluntarily and responsively, and absent any coercion or duress, this written statement should not be suppressed.  Briones, 390 F.3d at 614; LeBrun, 363 F.3d at 724.

### 4.    Oral Statements, Outside the Apartment, on May 7, 2009

As noted above, the procedural safeguards prescribed by Miranda only apply to persons who are subjected to interrogation and who are in custody.  Montejo v. Louisiana, 129 S. Ct. 2079, 2090 (2009); Mathiason, 429 U.S. at 494-95.  To be sure, police questioning always involves some degree of pressure to confess.  Mathiason, 429 U.S. at 495.  But in a noncustodial situation, there are no "inherently compelling pressures" to confess, which make these situations the least likely to pose a risk of coerced waivers.  Montejo, 129 S. Ct. at 2090.  "When a defendant is not in custody, he is in control, and need only shut his door or walk away to avoid police badgering."  Id.

On May 7, 2009, police officers executed a search warrant for Hyer's apartment. In executing the warrant, the officers handcuffed Hyer until the residence was secured. Once secured, Officer Gomez uncuffed Hyer and took him outside, where he identified himself and Det. Starzyk. Officer Gomez told Hyer he was not under arrest, and advised him of his constitutional rights. Hyer indicated that he understood these rights. For about thirty minutes, Hyer made oral statements in response to questions from Officer Gomez. Officer Gomez secretly recorded this interview.[4]

After listening to a recording of this interview, it is clear that Hyer and Gomez each had separate purposes and reasons for making the statements they made. Officer Gomez wanted Hyer to make statements that incriminated himself. Hyer wanted to obtain a lenient outcome from the investigation by cooperating with the police and providing information. Their voices demonstrated these distinct purposes, as well as the tension between them based on these conflicting goals. Even though he preferred not be in the position he found himself in, and even though he knew he was not compelled to do so, Hyer continued to provide information about himself in an effort to persuade the officer not to prosecute. During the course of this interview, Hyer was responsive, was not intoxicated, and appeared to be intelligent. The nature of this interaction indicates Hyer was not in custody during the interview.

An analysis of the <u>Griffin</u> factors also indicates that Hyer was not in custody at the time of the interview. Before starting the interview, Gomez informed Hyer that he was not under arrest, and that he had the right not to answer his questions. In addition, the interview occurred outside Hyer's apartment, and not in a police station or police setting. <u>See</u> <u>Czichray</u>, 378 F.3d at 826 ("When a person is questioned 'on his own turf,' [courts] have observed repeatedly that the surroundings are not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation."). There is no indication Officer Gomez restrained Hyer's freedom of movement during the questioning. In

---

[4]Officer Gomez's decision to secretly tape this interview does not implicate the Fifth Amendment. <u>See</u> <u>Guenthenspberger v. Carter</u>, 81 F. App'x 858, 860 (7th Cir. 2003) (per curiam).

fact, he did not forbid Hyer from going upstairs to get dressed.  Officer Gomez did not employ deceptive or strong-arm tactics during the interview, and none of the officers drew their weapons, or made any threats or misrepresentations.  Finally, the officers never arrested Hyer.  Officer Gomez did not specifically tell Hyer that he would be arrested if he declined to willingly accompany him to the station.  Hyer was not in custody when Officer Gomez interview him on May 7, 2009, outside his apartment.

Because Hyer was not in custody, the protections of <u>Miranda</u> and <u>Edwards</u> did not attach outside his apartment.[5]  <u>Montejo</u>, 129 S. Ct. at 2090.  Because he was not in custody, any invocation of his right to remain silent (<u>see</u> Finding 14(c) ("I am not going to say any more. . . .")) did not trigger a requirement that Det. Starzyk stop the interview.  The subsequent statements are not subject to suppression, unless they were not made voluntarily, which the undersigned does not find.

The simple fact that Officer Gomez informed Hyer of his constitutional rights before the interview does not change this analysis.  <u>United States v. Beard</u>, 119 F. App'x 462, 467 n.4 (4th Cir. 2005) (per curiam) ("Even assuming . . . Officer Provost gave Beard the full panoply of <u>Miranda</u> warnings, this fact would not, when combined with the other circumstances of Beard's confession, be sufficient to transform what was an otherwise non-custodial situation into a custodial one."); <u>United States v. Harris</u>, 221 F.3d 1048, 1051 (8th Cir. 2000) (expressing skepticism that a reading of <u>Miranda</u> rights can transform a noncustodial situation into a custodial one).  None of Hyer's statements from this interview should be suppressed.


**5.    Oral Statements, at the Police Station, on May 7, 2009**

_____

[5]In <u>Edwards</u>, the Supreme Court held that once a suspect invokes his constitutional right to counsel, police officers must stop questioning the suspect until counsel has been made available.  <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981).

As noted above, the procedural safeguards prescribed by <u>Miranda</u> only apply to persons who are subjected to interrogation and <u>who are in custody</u>. <u>Montejo</u>, 129 S. Ct. at 2090; <u>Mathiason</u>, 429 U.S. at 494-95.

After Officer Gomez interviewed Hyer outside his apartment, Hyer agreed to accompany the officers to the St. Louis County Police Department. Hyer did so willingly and voluntarily. Officer Gomez and Det. Starzyk drove Hyer to the police department in a police car. The drive took about two or three minutes, and during the drive, there was no conversation between Hyer and the officers. Hyer was not in handcuffs while he was in the police car. Once Hyer arrived at the station, Det. Starzyk reminded him that he had come to the police station voluntarily, and that he had received his <u>Miranda</u> rights at the apartment. Even so, Det. Starzyk presented Hyer with a new waiver of rights form at the station. Hyer signed this form, and then made oral statements.

The interview began around 7:09 p.m. At 7:36, they took a break, and then restarted the interview at 7:46. From 7:46 until 8:06 the interview continued. After another break, the interview resumed at 8:08, until it concluded at 8:41 p.m. After the interview ended, Hyer left the police station without being arrested.

Looking to the <u>Griffin</u> factors, Hyer was not in custody when he made oral statements at the police station. Before starting the interview, Det. Starzyk reminded Hyer that he had come to police station voluntarily. He also informed him that he had the right to remain silent and the right to a lawyer. <u>See</u> <u>United States v. Elzahabi</u>, 557 F.3d 879, 883 (8th Cir. 2009), <u>cert. denied</u>, 129 S.Ct. 2781 (June 8, 2009) ("The most obvious and effective means of demonstrating that a suspect has not been taken into custody is an express advisement that the suspect is not under arrest and that his participation in questioning is voluntary."). There is no indication Det. Starzyk restrained Hyer's freedom of movement during the questioning. There were two breaks during the interview, and Det. Starzyk offered Hyer the chance to get water and use the restroom. While Hyer did not initiate contact with the officers, Det. Starzyk did not employ any deceptive or strong-arm tactics during the interview. After informing Hyer of his rights, Det. Starzyk explained the nature of the investigation in clear terms. As the interview proceeded, Det.

Starzyk never drew his weapon, or made any threats or misrepresentations. Finally, once the interview concluded, Hyer left the station without being arrested. Under the circumstances, Hyer was not in custody at the police station. Accordingly, his statements should not be suppressed. See Mathiason, 429 U.S. at 495.

The fact that Hyer was questioned at the police station does not change this conclusion. See id.; Elzahabi, 557 F.3d at 884. In both Mathiason and Elzahabi, the courts found that the suspects were not in custody, even though they had been questioned at the state patrol office and the FBI office, respectively. Mathiason, 429 U.S. at 495; Elzahabi, 557 F.3d at 884. In fact, in Elzahabi, the interview was noncustodial even though it lasted for over five hours and took place in the middle of the night. Elzahabi, 557 F.3d at 882-84. "Where there is no clear indication that the defendant's freedom to depart is restricted, a police station interview is non-custodial." Id., at 884; see also Feltrop v. Bowersox, 91 F.3d 1178, 1181 (8th Cir. 1996) ("That the questioning takes place in a police station is relevant but not controlling [to the question of custody]."). None of Hyer's statements from this interview should be suppressed.

## 6.    Ambiguous Invocation

Even assuming that Hyer was in custody at the police station, none of his statements from the police station should be suppressed.

A suspect in custody must be warned, before being interrogated, that he has the right to remain silent, the right to consult with an attorney, and the right to have an attorney present during the questioning. Davis v. United States, 512 U.S. 452, 457 (1994); Miranda, 384 U.S. at 444. The police must explain these rights to the suspect before questioning him. Davis, 512 U.S. at 457. If the suspect effectively waives his right to counsel and right to remain silent, then law enforcement officers are free to question the suspect. Id. Once questioning begins, the suspect may still invoke his right to counsel and his right to remain silent. Id.; Miranda, 384 U.S. at 473-74. Once a suspect requests a lawyer, the police must stop their questioning until an attorney is actually present, or until the suspect reinitiates the conversation.

<u>Davis</u>, 512 U.S. at 457.  Likewise, once the suspect indicates that he wishes to remain silent, "the interrogation must cease." <u>Miranda</u>, 384 U.S. at 473-74.

To invoke the right to remain silent and end questioning, the suspect must make a clear, consistent expression of the desire to remain silent.  <u>United States v. Ferrer-Montoya</u>, 483 F.3d 565, 569 (8th Cir. 2007) (per curiam).  Indirect, ambiguous, and equivocal statements or assertions of an intent to exercise this right are insufficient.  <u>Id.</u> To invoke the right to remain silent, a suspect must be more than simply evasive and reluctant to talk.  <u>Id.</u> (finding statement "'What else can I say?'" was not a clear expression of the desire to remain silent); <u>but see</u> <u>United States v. DeMarce</u>, 564 F.3d 989, 994 (8th Cir. 2009) (finding defendant invoked his right to remain silent when he said "'You know, I don't want to talk to you. I'm not going to sign nothing,'" and then walked out of the room).  To determine whether a defendant has unequivocally invoked the right to counsel, the court considers the defendant's statements as a whole.  <u>Simmons v. Bowersox</u>, 235 F.3d 1124, 1131 (8th Cir. 2001).

When Hyer arrived at the police station, Det. Starzyk reminded him that he had come to the police station voluntarily, that he had not been handcuffed, and that he had been read his rights at the apartment.  Det. Starzyk also presented Hyer with a new waiver of rights form.  Hyer initialed this form, asserting that he understood his rights.  After initialing the form, Det. Starzyk began interviewing Hyer.  Hyer made oral statements in response to the detective's questions.

These statements constituted a waiver of Hyer's rights.  <u>See</u> <u>Butler</u>, 441 U.S. at 372-76.  Before making these statements and while making them, the officers did not subject Hyer to any threats, promises, or misrepresentations.  He did not appear fatigued or intoxicated, and he answered the officer's questions without any form of coercion.  Under the circumstances, Hyer's statements were voluntary and responsive, and were not induced by any improper government action.  <u>See</u> <u>LeBrun</u>, 363 F.3d at 724.  Accordingly, Hyer's statements to the officers after he was read his <u>Miranda</u> rights may be used against him without violating his Fifth Amendment rights, unless he invoked his right to counsel or his right to

remain silent sometime during the questioning.  See <u>Davis</u>, 512 U.S. at 457, <u>Miranda</u>, 384 U.S. at 473-74.

At the beginning of the interview, Det. Starzyk asked Hyer if was willing to talk to the officers.  Hyer answered, "Well, now that you're saying it is going to be used against me in a court of law, I really don't want to.  I mean I tried to be as honest and forthright with you."  The conversation continued from there.

Looking to <u>Ferrer-Montoya</u>, Hyer did not express a clear intent to remain silent.  He did not make a definite assertion; he did not say, "I don't want to talk to you" or "I have nothing to say" and then stop speaking.  See <u>Anderson v. Terhune</u>, 516 F.3d 781, 787-88 (9th Cir. 2008) (en banc), <u>cert. denied</u>, 129 S. Ct. 344 (Oct. 6, 2008) (finding defendant unambiguously invoked his right to silence when he said "'I plead the Fifth,'" and suggesting that statements "'I don't even wanna talk about this no more'" and "'I'm through with this.  I'm through.  I wanna be taken in custody'" were also unambiguous invocations of the right to silence); <u>Arnold v. Runnels</u>, 421 F.3d 859, 866 (9th Cir. 2005) (Bright, J.) (finding defendant unambiguously invoked his right to silence when he said "he did not want to talk on tape"); <u>McGraw v. Holland</u>, 257 F.3d 513, 515-18 (6th Cir. 2001) (finding defendant unambiguously invoked her right to silence when she repeatedly said "'I don't want to talk about it'").  Beyond that, the phrase "I really don't want to" was in the middle of Hyer's sentence, followed by an indication that he had attempted to tell the truth, and that he might be interested in further conversation.  See <u>United States v. Williams</u>, No. 09-298 MJD/FLN, 2010 WL 573148, at *14 (D. Minn. Feb. 11, 2010) (noting that the defendant's statement about being "'done answering questions'" was part of a much longer, uninterrupted narrative).  Under the circumstances, Hyer did not clearly invoke his right to remain silent.

Looking to the remainder of the interview, there are no other statements that express an unambiguous invocation of the right to remain silent or the right to counsel.  Hyer's statements at the police station should not be suppressed even assuming he was in custody at the time.


<u>**CONCLUSION**</u>

For the reasons stated above,

**IT IS HEREBY RECOMMENDED** that the motions of defendant Andrew Joseph Hyer to suppress evidence of statements (Doc. 23) and to suppress physical evidence (Doc. 24) be denied.  All statements and evidence should be admitted.

**IT IS FURTHER RECOMMENDED** that the motions of the government for a determination of the admissibility of the arguably suppressible evidence (Doc. 15; Doc. 21) be denied as moot.

**IT IS HEREBY ORDERED** that the motion of defendant Andrew Joseph Hyer to file a post-hearing brief out-of-time (Doc. 38) is sustained.

The parties are advised they have until close of business on May 13, 2010 to file documentary objections to this Order and Recommendation. The failure to file timely documentary objections may waive the right to appeal issues of fact.

<u>**ORDER SETTING CASE FOR TRIAL**</u>

At the direction of the District Judge,

**IT IS HEREBY ORDERED** that this action is set for a jury trial on June 14, 2010, at 9:30 a.m.

    /S/   David D. Noce    
**UNITED STATES MAGISTRATE JUDGE**


Signed on April 29, 2010.